At all. On behalf of the appellant, Mr. Michael Merrick. On behalf of the appellee, Mr. David Oppenheimer. Thank you. Before we begin, I just want to indicate that Justice Spence was unable to be here today due to circumstances beyond his control. He will, of course, review the tape of the argument before any deliberations on the case. Thank you. Mr. Merrick, you may proceed. Thank you, Your Honor. Good morning. Good morning to the police, the court. I'm Michael Merrick, and I represent Maryland Casualty Company and the Insurance Company of America. They are both part of the Zurich, North America group of insurers, so we often refer to them collectively as Zurich. This case comes before the court for a de novo review of the summary judgment entered by the circuit court, which also included a choice of law determination, which should be decided de novo by this court as well. Zurich is here today as appellant seeking to reverse the $8 million summary judgment entered against it on account of an underlying stipulated uncontested judgment. Because a 2011 summary judgment in its favor was vacated, and ultimately, judgment was entered in favor of the class. The reason for that was just one, and that is in 2011, the Illinois appellate court for the first district came down with a decision, Pekin v. Xdata, which required, so said Judge Mullen, required her to simply ignore, put her head in the sand and ignore a huge body of case law from the federal district court and from the third circuit interpreting what Pennsylvania law should be. Do you think she was an error? I'm sorry, Your Honor? Do you think she was an error, her reading of that case? I think she was, she certainly could have looked at prior Illinois case law, such as the Banks case, such as the Sterling case. She could have looked at, for example, the U.S. Supreme Court case in Phillips and said, I find Xdata distinguishable, but I don't have a issue with her following what the first district said. It was a rule of law that was laid out. Ultimately, it's the wrong rule of law for reasons which I'll explain, but I don't think the circuit court erred by feeling that she was bound by, by Xdata at the time. So we had two diametrically opposed opinions. One where Zurich won and one where it went the other way. This court, of course, is not bound by Xdata, nor, frankly, is it bound by the more recent decision in Bridgeview, but it's for this court to decide what the proper approach is when faced with federal precedent predicting state law in the conflicts context. So it presents a choice. The first choice is this. Is it proper for a court to consider federal court predictions, eerie predictions of state law, as several cases in this state the U.S. Supreme Court have held? Is it proper for courts to consider as persuasive authority for whatever it might be, good, bad, or otherwise, of federal court decisions making eerie predictions in a variety of contexts? Is it proper for this court to follow Lapp and Hickey, the longstanding rule which applies to the choice of law approach to insurance policies, or instead following a different Townsend type of approach which applies just to tort cases? And finally, should this court also follow the logic and the reasoning of Bridgeview, which rejects Xdata on our hand? The other choice, and the one that the class counsel would have you follow, would be to apply this Xdata rule, which simply is the head-in-the-sand approach, which pretends that federal court decisions don't exist. The first choice is preferable, and I'd like to explain to you why. So we're on the same page. Choice of law is a three-step process. We don't have any disagreement with class counsel on that point. The first is to determine whether there is a conflict. The second is to conduct a choice of law analysis. And the third is then to apply the law. Now, Xdata didn't discuss precedent vis-a-vis persuasive, did it? That's correct, Your Honor. It applied a black-letter rule that said, we cannot consider federal court-area predictions. So, implicit in that would be that the trial court could have considered treatises, but it couldn't consider federal court decisions? It's a good question, Your Honor. I think Judge Mottlin, in her first decision, did a really nice job of pointing out that data could be considered by a court. It could be treatises. It could be law review articles. It could be federal court decisions. It could be anything that would help inform the court on what a foreign state's law should be. And she went, let me add, she did a terrific job doing her own research. She found a law review article written by Professor Corbin, which made this very point. That wasn't even something decided or cited by the parties. Now, let me also point out to the Court that if you go look at this Court's decision in Eclipse, it's important for a couple of different reasons. Eclipse was a 2007 decision. Class Counsel was also involved in that case. But it raises several different points. One is that it started the analysis with the conflict between two states' laws, evaluating whether there was a conflict on this issue of Estoppa, duty to defend Estoppa. And we think that's appropriate here as well. And there's a plain conflict between Pennsylvania law and Illinois law on that point. But in the context, take a look at the decision. What this Court did in that case is it actually looked to federal precedent. It looked to a District of Colorado case, opining on what Colorado, excuse me, what Minnesota law was, and evaluated that for what it was. It did not, as Ex Dato would say, this Court did not say we can't consider it. But instead, the Court evaluated it. Now, ultimately, the analysis was dismissed. But that's not the point. The point is it was evaluated. Now, this rule, this Ex Dato rule, which Class Counsel is so pleased to trump it, should be applied for five separate reasons. One is it conflicts with other case law. Okay, Phillips, Banks, I said Eclipse, it conflicts. Look back at what Judge Mullen did the first time around. She was presented with the option of following the trial court's decision in Ex Dato, this head in the sand approach. And she rejected that. She found it made no sense, as it doesn't. The Sterling case as well is another case where the appellate court has looked to things other than state court precedent to try to determine what another state's law was. Most recently, Bridgeview flatly rejects the Ex Dato rule. So the same district that created the rule has now flatly rejected it. And what the Court said is that because the decision in Pekin conflicts with better reason cases and the purpose of the choice of law doctrine, we do not follow Pekin insofar as the Court in Pekin said, quote, there is no Indiana state law on the issue before us, so there can be no conflict with Illinois law. The second point I want to make is that the looking to federal court predictions, eerie predictions of state law makes particular sense in this case. This isn't a situation where there is one case out there which says the law on fax blasting coverage is such and such. And let me add, too, it's not our position that a circuit court or an appellate court is bound to follow federal precedent. It is simply allowed to consider it and to decide, to put its judicial thinking cap on and decide if it's persuasive and reflective of what the law of that other state is or should be. So what we have here are four separate and distinct decisions of the U.S. District Court in a third circuit affirmance of one of them. We have seven judges that have looked at the question of coverage for property damage caused by an occurrence in the fax blasting context. The next day to come down with the decision that absence of evidence is evidence of absence. I'm sorry, Your Honor, I didn't follow you. The absence of evidence is evidence of absence. If there is no evidence to give a court a basis upon which to make a determination whether there is a conflict, then there must not be a conflict. Right. If you close your eyes and pretend that this whole body of law doesn't exist, therefore there can't be a conflict. And we say that it's proper for the courts to look at this. I also want to cite you to the affidavit of Ronald Schiller. It was admitted by the circuit court. And he lays out the backgrounds of the various judges that decided these cases. They all came from Pennsylvania private practice. Most were state court judges. They have wonderful reputations and the opinions, too, speak for themselves. And I urge you, we will leave with you the Melrose case, the Advent case, Express Products, and David Randall would provide copies to the court. Please read those cases. They are well-reasoned, well thought out, and the judges, and Mr. Schiller's affidavit, lay that side-by-side these cases. Mr. Schiller explains who these judges are, where they came from, his experience with them, and that has come in uncontested, uncontroverted, and it's part of the record in this case. Going back to my other points as to why, I've mentioned other contexts. It's routine for our courts to look to federal predictions of state law. We see that the Supreme Court has done it in a number of cases that we cited. Lapham, Hickey, General Agents, and Swiderski as just some examples. Go through the five points seriatim. Very quickly, please. We've already done one, possibly. Yes. First, let me clarify. First, the X data approach would conflict with other decisions from this state and the U.S. Supreme Court. Second, it makes sense in this particular case because of the body of case law, and substantial body of case law, which interprets Pennsylvania law from the federal system. Third, in other contexts, it's routine for the courts of this state to look to the persuasive value of federal eerie predictions. I've mentioned some of the Supreme Court cases which go that way. Fourth, a contrary rule makes absolutely no sense at all. Mr. Oppenheim was challenged by the First District in Bridgeview to explain the logic behind it, and he couldn't do it. Maybe he'll try today, but there is no logic or rule of law which suggests that we, as a system, ought to ignore a federal judge's opinions because they happen to be wearing a robe and sitting in 219 South Dearborn as opposed to in one of the circuit courts in the state, for example. And the fifth point I'd like to leave you with is this. I think it's important and telling to see how X data evolved. X data was a case created by class counsel. If you go back to the briefs, and Amicus counsel makes a point of this, but if you go back to the briefs, you will find, both at the trial court level and at the appellate level, you will find that Phillips was not cited. Certainly, it wasn't cited for the proper proposition. Actually, they miscited it and contended that the dissent was the majority opinion. They did not cite Banks. They did not cite Sterling. The cases which go the other way were never cited to the court, so they helped create the law which they now want to impose here in this case. I think if you look at the history of it and see, and frankly, you know, the insurance company lawyer did not cite the cases that we cite to show that it's routine in this state for courts in the conflict setting and in other settings to look to the persuasive value of federal area predictions. Did you find any Pennsylvania cases or treatises or anything that intimate that there is or could be coverage under property damage, under the property damage provision? They've only come up with one case, Your Honor. It's the Bretheren case, and that was a case which was ultimately vacated or the claim was withdrawn before it went up on appeal. It was a trial court decision. We say when you compare the nature and the quality of what we have with the federal decisions to that, it's far outweighed, and the federal cases are much more persuasive. I would add one thing. If you take a look at the original Bretheren decision, it does, it itself, the state court, relies upon federal cases for various propositions. It cites Melrose. So even in the Pennsylvania state court system, you know, those courts will look to the federal courts for guidance on what Pennsylvania law should be, and that's another point that Mr. Schiller makes quite well in his affidavit. If we were to buy your argument, are you asking to remand this back for further proceedings for Judge Mullen to review this again, or what are you asking? Your Honor, we're asking for a remand with directions that summary judgment be entered in our favor. We believe that based on the 2011 decision, which she's already rendered, she's already done the conflicts analysis, and by the way, nobody here, just so we're clear, on the second step of the conflicts analysis, everybody agrees that the lap and picky factors approach to Pennsylvania law, Pennsylvania has the most significant context for this case. They don't contest this. We agree to that. So in this court's de Niro review, take a look, and it's identical language in both opinions, by the way. She didn't change her work. So if you take a look at pages 22 through, 26 through 35 of the 2011 opinion, 47 to 57 of the 2012 opinion, it's identical, and there's no issue on that, okay? The issue is whether or not, you know, as I just said, it would somehow be the rule of law or the contract cases, which, plainly, it does not. All right, counsel, thank you. Thank you. We'll have time for rebuttals. Thank you. Mr. Oppenheimer, your procedure. Thank you, Your Honors. May it please the Court. In reading insurer's argument and in listening to the argument this morning, it seemed to call to mind a very famous advertising campaign to paraphrase where's the law. They've had three briefs and extensive argument this morning to identify a single Pennsylvania statute or a single decision by a Pennsylvania state appellate court or the Supreme Court that conflicts in any way, in any step in the property damage analysis, with something that's been done in this, in this state and the black letter law in this state. They have not done it. They cannot do it. I think they conceded that in their brief, that there is no Pennsylvania law in this. So we have, you know, they're asking us to look to other things. Well, but I, I, I think that that's not correct. There's plenty of Pennsylvania law. And in fact, what they've said in their certify is, well, we should trust what the federal trial court said in Melrose because they cited ten Pennsylvania cases. Those ten Pennsylvania cases are Pennsylvania law. And if you look at them, eight of them cite basic insurance coverage propositions that are the same as Illinois. The other two have to do with the analysis of this particular coverage question, Olitski and Moen. And these are the same cases that the circuit court here analyzed in detail. They're the same cases that say the same things that Miller, Lyons, and Shelburne said. That's the law. The law is the same. And so what we're getting is an attempt to conflate two completely different things. And that is the analysis of whether there is a conflict of state law. And once you're in the position of predicting what a state's law might be, or as counsel, I think, revealingly put it, should be, what you can look at. And I don't think we're dealing at all with the second analysis. You don't get there because what the Supreme Court said in Townsend is you only get there if there's an actual conflict of law. And you can't create an actual conflict of law out of whole cloth, out of predictions, out of what you think the other state's law should be. I mean, essentially, the Zurich argument boils down to this court ought to just, based on no precedent at all, decide that Pennsylvania would decide this argument differently than what its prior Illinois appellate courts have done. There's no support for that. There's no question, and they don't contest, that the coverage exists under Illinois law. And I would point out that this is part of a growing national trend. The Supreme Court of Missouri just considered the same question and found coverage. The Supreme Court of Michigan applying Pennsylvania law and discussing it in detail found coverage. And importantly, what you didn't hear anything about in counsel's presentation was what was actually found in the underlying case here. It's all a theoretical argument. Should it be X data standard? Should it be the Bridgeview standard? Should it be some other standard? The facts here are established in an underlying judgment order that held that Penswood acted negligently and that Penswood did not intend to injure anyone. Okay. Well, next the question is, is that covered under this Pennsylvania courts? From Olitski and Moen all the way through to DeCoster that we cite in our briefs have said that in those circumstances there is coverage. And that ought to be the end of the analysis. There is no law that conflicts with Illinois law. Therefore, under the principles established in Townsend in prior cases where there is no actual conflict, Illinois law applies and we're done. Is coverage determined by the agreed order? Is it determined by the allegations in the complaint? The duty to defend is determined by the allegations of the complaint with all possible factual constructions construed in favor of coverage, whereas the duty to indemnify ultimately would be determined by the findings. But I don't think that question has any significance because certainly the possibility that Penswood didn't intend to injure anybody and the possibility that they acted negligently is certainly inherent in the complaint. And that's essentially what Shelbourne says. What is the act of negligence in intentionally sending out thousands of faxes to people who have not indicated a willingness to receive them? The act of negligence is discussed in detail by the First Amendment. There was a belief that these people had consented to receive them, which was given to Penswood through its dealings with a third party who supplied the list of the fax recipients. Your complaint alleged unambiguously unsolicited faxes, correct? Unsolicited, however, it also alleged that Penswood knew or should have known that they were unsolicited. It did not allege that they knew that they were unsolicited. They have to be unsolicited to be actionable, but if there's a mistaken belief that they were solicited, then it's an action of negligence. And of course, Zurich here elected not to defend at all. They elected not to participate in the case, and so they're stuck with what the judge ultimately found. Do you agree that Melrose goes 180 degrees from what you just said? I do not, actually. Melrose involved a circumstance where there was actually evidence in the record that the insured defendant did know that the faxes were not consented to. There are statements in Melrose, of course, that disagree with what the first district has said in Shelbourne, but of course those statements in turn were disagreed with by the only Pennsylvania state court to look at this issue, which was Brethren. And they were disagreed with again by the Michigan Court of Appeals. It was the trial court, right? Brethren. Brethren was the trial court, yes. Earlier you said it was the Michigan Supreme Court. If I did, I misspoke. It's the Court of Appeals in Lake City. Although the Supreme Court has since elected not to take the insurer's petition to take that appeal. The Supreme Court took Bridgeview, didn't it? The Supreme Court did take Bridgeview. The opening brief will be filed by our side tomorrow. I found it interesting as well that counsel relied on this court's handling of Eclipse because I actually was planning to do the same myself. What this court did with Eclipse was deal with another situation where an insurer came in, didn't like the body of developed Illinois insurance coverage law, and so tried to come up with a conflict with Minnesota law in that case whether the Doctrine of Estoppel applied. And what they did was they put forward three cases, at least the opinion discusses three cases. Two of them are actually Minnesota cases. And what this court did was they analyzed in detail what those cases said and came to the conclusion that they didn't support the insurer's position. Then the third case came up and it was a district court case called, a federal district court case called Flannery. And what this court did with Flannery was it took a look and said, okay, well Flannery is just a federal prediction. I don't really care what the holding of Flannery is, but Flannery is based on a Minnesota case. Let's talk about that Minnesota case. And the ultimate conclusion in talking about the Minnesota case was, and I quote, Flannery cited the, I'm sorry,  or we agree with Eclipse, I'm sorry, we agree with Eclipse that Flannery cited Alton inaccurately. And that's really the same situation we're dealing with here. Because if you look at any of these federal trial court predictions that is essentially Zurich's entire case, they all loop back to one case, and that's Olitski. So really the question is, if Olitski is different in some way from the canon of Illinois law that produced Shelhorn, then they're right and there's a conflict of law. This seems like an argument that wasn't made to the trial court. I was under the impression that your motion to reconsider was based upon the Judge Themis Karnes' decision. And as such, it disqualified Judge Mullen from considering the merits or the persuasive aspects of federal case law. And on appeal, you're not arguing the proposition that that is correct. You're arguing facts. You're arguing cases that talk about how other cases with other case law comes up with a different factual conclusion as to whether or not there's a conflict. And we're supposed to determine whether or not the trial court committed error. The trial court originally rendered judgment in favor of the defendants. Based upon a motion to reconsider filed by your client or you, she reversed her position. And it would seem to me logically that if she reversed her position based upon your arguments made in your motion to reconsider and those arguments were faulty, it would seem to follow that ergo her granting of your motion to reconsider and her changing the nature and extent of the judgment was also an error. So I would like you to discuss whether or not the federal case law is incompetent to be considered or we are not allowed to consider the merits of federal case law. Because you seem to be beating around the bush citing to cases where the state actually made a ruling and then the federal court came along either as the tail or the tail. So please emote. Absolutely. We've been consistent. X data got it right. In order to deviate from Illinois law, you need an actual conflict of state law. Federal predictions are not state law. Period. That's true. Because the way you've couched it, you're at least the way I'm saying that it can't be considered for persuasiveness just as a treatise or a law review article or a U.S. Supreme Court decision that might indicate what it believed was a particular state's law. Are you telling us that we're not supposed to consider a U.S. Supreme Court decision as to what another state's law might be? I am saying that you need an actual conflict of state law. What X data dealt with is the same thing that this case did. I agree with you. We do need an actual conflict. That isn't the point. The point is how do you go about analyzing whether or not there is? And it seems that you convince Judge Mullen that in the process of analysis, you cannot consider as competent evidence or whatever you want to call it. You cannot consider any federal case law as to what a state law might be. It is inadmissible. It's incompetent. It's gross hearsay. Isn't that your argument? Or at least wasn't that your argument before Judge Mullen? Our argument before Judge Mullen is that the federal predictions themselves cannot be the source of a finding of a conflict. That was our judge argument in X data. It's our argument in Clark and the Supreme Court. It's our argument here. If it cannot be a source, then you are suggesting that it cannot be considered in any nature, extent, or form? Well, I think that it can be considered in the same way that my brief is considered. It's an analysis. And to the extent that the analysis contains anything that's actually state law on which a conflict can be based, that's fine. These federal cases don't do it. And that was our argument on reconsideration as well. It's possible to have a federal court who finds a Pennsylvania law that says, for example, we don't, in our state, recognize the doctrine that if you act intentionally but don't intend to injure, that it's an accident for insurance purposes. There are states that follow that rule. California is one. Just so I'm clear in my understanding, you're saying that you not only during the motion to reconsider argued that federal case law cannot be considered in any way, it was also your position that you argued to Judge Mullen that the federal case law was consistent with your position that there was no conflict. That's not what I said, Your Honor. I thought that's what you said. I'll listen to the tapes when they're available. What I said is that the actual, what the result of a federal case is, is inconsequential for the purposes of determining whether there is a conflict. Only the analysis, only the source material from the actual state law is relevant. And if you can glean a conflict, even if it's not on the ultimate question to be decided, that would then logically lead a court to an opposite outcome, there is a conflict. If you cannot glean such a conflict from the foundational state law, there is no conflict under Townsend. That is what X data says, that is what we have said. That is our position. There's kind of a dearth of analysis in X data when it comes to this issue. One paragraph, paragraph 23 of X data really kind of sets forth that we're not allowed to look at federal law in this regard, even as persuasive. And it really just kind of says it doesn't talk about any of the cases that we've all been talking about and that we've been reading about in your briefs. It's somewhat disheartening, I guess, to have a rule of law that maybe a lot of people are saying completely goes opposite every other case that we've ever seen with no analysis. Well, it is what it is, Your Honor. But I would take issue with the notion that X data is inconsistent with everything else. It's quite consistent with Townsend, with Sterling, with Eclipse that says that what matters is whether there is a conflict of state law. Federal predictions are not state law. That's what X data says. If I could address for just a moment the issues on the cross appeal. Unless Your Honor has had more questions. It's pretty simple. This is an issue where the underlying judgment was entered. It wasn't appealed. Zurich never intervened to try and contest it. They didn't file a 1401. The underlying judgment in black and white says post judgment accrues from the date of this order. You look at the Zurich policy. Zurich policy says we pay post judgment interest irrespective of limits. And so I don't think that there's any basis to not include that as part of the award. The court relied on Eclipse, but the key difference in Eclipse and Lawrence, which is what Eclipse relies on for this point, is the fact that those judgments did not award such post judgment interest. And the plaintiff in those cases was asking the appellate court to use the statute to impose it. Here the interest was awarded and all we're asking is for the court to use the plain language of the policy and award it to us. Thank you, Mr. Oppenheimer. You will have a chance for rebuttal on the cross field. Thank you, Your Honor. Mr. Merrick, you may proceed. Thank you, Your Honor. If I might ask how much time do I have remaining? I think it's five minutes. Ten minutes. Okay, thank you, Your Honor. As we listen to Mr. Oppenheimer, the question that never gets answered is why this ex data ruling makes sense. There is no logic behind it that would require a court to stick its head in the sand and ignore other sources of the law. And he's not been able to answer that question yet in any of these proceedings or in the Bridgeview case. Justice Burke, I'm not sure I answered your question before as to what I would like you to do in connection with this appeal. If time was static, I'd say remand for entry of judgment in Zurich's favor in accordance with the 2011 decision because it's a right decision. The only unusual part is that what's happened in the interim is that the Bridgeview case has come out and rejected flatly ex data as a rule of law in the First District. And we have two more federal cases that come out the same way as Melrose. We have the Ramble case and we also have the Express Products case. So there's more to this than was the de novo review. So it would be appropriate too for this court to issue an opinion in much in sync with the 2011 decision, but adding these additional points that have come up in the meantime. But in either event, a remand for the entry of judgment in Zurich's favor would be appropriate. Mr. Oppenheim asked this question, what's the law? And he also asked the question, we also talked about ex data, and Your Honors pressed him a bit for why that should be the law and what the logic behind it, what the support was and how suggesting was inconsistent with other cases than it is. The statement that Mr. Oppenheim made, which I agree with, is ex data is what it is. It's an unsupported, aberrational decision that came about through a misrepresentation of what the law was as of that time. It should be disregarded just as Bridgeview disregarded it. Now, we win in this case even if the court somehow decides that it cannot look to federal precedent or decides that the federal cases aren't particularly persuasive. And that's because on state law, established state law, there is a conflict between Illinois and Pennsylvania. There is a conflict on the issue of estoppel. In Eclipse, that was the very first issue that this court provides that if a carrier breaches its duty to defend, it gets a stop from raising any defenses, such as, say, the expected and intended injury exclusion. That's not the law in Pennsylvania. The Gideon case from 1963 rejects that rule, as does American States v. State Auto. Now, there's a convoluted argument that class counsel presented to Judge Mullen that was accepted by her, but falls flat. The basis for the idea that there was some limited estoppel accepted in Pennsylvania is an entirely different concept and has nothing to do with the contractual estoppel doctrine, which has been rejected in Pennsylvania. It emanates from a Third Circuit case in 1985 where there was a doctor who sold a diet book. People read it and claimed they were injured by reason of following the diet advice. They gained weight? Or whatever it might be, Your Honor. So the case was tendered to various different insurers. The malpractice carrier of the doctor, the homeowner's carrier, maybe the general liability carrier. Ultimately, the case settled before there was an adjudication of whether the strict products count was the basis for that. And in that context, the court said, well, the non-defending insurer can't come back in and contest which causes of action were settled and that type of thing. That's not what we have here. What we have here is a question based on the expected or intended injury exclusion, whether or not the Copenhagen person, there's evidence of record, as I think you alluded to, Judge McLaren. There's evidence of record that they knew exactly what they were doing and they knew what was going to result. Once they started faxing or engaged in this fax blast campaign, on the other end of the line, paper would be consumed, toner and ink would be consumed. That's in the record and those are the facts. Now, where Illinois law is different on this issue from Pennsylvania law is Shelborn says, well, you know, that exclusion will not apply if somehow the insured believed there was permission to fax. In Pennsylvania, okay, the case is Olitski. And take a look. Melrose cited Olitski and evaluated it as part of its analysis. The test there, unlike the test in Illinois, is whether damages of the same type with the insured, which the insured intended to cause, resulted. Okay? That's different. It's looking at the damages which were intended as opposed to whether there was a belief in permission. Two different tests entirely. So here's why it matters. Because if Zurich is estopped, it can't get to the testimony of the Kofenhofers as to what they knew they were doing and what would result. Because that would be the estoppel rule and it would be a natural outflow of Shelborn. But this wouldn't result in summary judgment. This would result in a trial. Would it not to determine whether or not judgment against your client should be precluded as opposed to a judgment against the perpetrator of the faxing? I don't think so, Your Honor. I think that the undisputed facts are they knew what they were doing. And if you take a look at the procedural posture of cases such as Melrose and, for example, you'll see that summary judgment is appropriate. There's no dispute that the Kofenhofers knew that they were using a toner, ink, and paper. That's not a contested fact. And under the Olitski standard, that's what matters. Because that was the very type of harm they intended and that's what resulted. Moving on. Let me ask you this, Lippy. Yes. Going to the estoppel argument as being a conflict, Judge Mullen in the later order found that the difference in any difference in the law would not be outcome determined. Do you disagree with that? Yes, I do. And that's because in Illinois, if we were estopped under ELFA, we could not raise the issue of what the Kofenhofers knew would happen. In Pennsylvania, we are able, because estoppel does not apply, we are able to raise that notwithstanding the fact that we might have had an obligation to defend. So our duty to indemnify will be determined by actual facts. Mr. Oppenheim made that point earlier. There's a different standard. In Illinois, they're conflated because of the estoppel rule. In Pennsylvania, they remain separate. One can breach the duty to defend in Pennsylvania, and the consequence of that is paying the defense costs that you were obligated to pay. There isn't the add-on, as there is in this state, of not being able to contest coverage on the merits. So, yes, I do disagree. And I think it was an improper reading of the Lynn case, which I pointed out before. We're not dealing here with a question of whether certain counts in the underlying case were covered or not covered. It doesn't matter. There were three counts. There was one for conversion, one for consumer fraud, and one for the Federal Fax Blasting Statute, the TCPA. What counts the judgment, the stipulated consent judgment were entered on doesn't matter. That was the Lynn case. What matters here are the facts, okay? And interestingly, if that was the rule that class counsel wanted to pass, they never did. They took it on the merits and argued that it didn't justify summary judgment. But they never said, hey, you can't even get there because you're estopped. A couple of other points, briefly, because I'm sure I'm... Your Honor, if it were, if the judgment were affirmed, interest wouldn't be appropriate under Eclipse. That's clear under the Eclipse case. Mr. Oppenheimer makes the point that somehow because they were involved in that case and they knew to slip in prejudgment interest into the order that was obviously not contested, that somehow that gives them a right to prejudgment interest. Not so. The statutory mandate provides that they don't get it because, as Eclipse said, a stipulated judgment is not a finding, an adjudication within the meaning of the statute that would allow them interest. So the fact that a lawyer in an uncontested setting slips something in like that doesn't give them any greater legal rights than if it wasn't there at all. Eclipse applies as much as Judge Mullen said. Again, in the event that the Court is inclined not to grant summary judgment, I'd say the Court below did not consider the TCPA exclusion of the 2005-2006 policy. There needs to be consideration of that. That's a $2 million issue. I thought there was a notice issue on that. Wasn't there a notice issue on that? There was, and she rejected it previously. That would still need to be considered. She didn't address it at all in the second opinion, Your Honor. That would need to be addressed. And I guess finally, since I am at the conclusion of my time, at the very least, if this Court doesn't find a lack of cooperation and collusion based on the way the judgment was entered, it at least creates a question of fact. Importantly, there was no evidence whatsoever of faxes during the two earliest of the Zurich policy periods. That's a $4 million issue. By filing cross motions for summary judgment, aren't you agreeing that there are no questions of fact? Not necessarily so, Your Honor. If there was a perfect match as to the issues that we were seeking to have the Court adjudicate, we raised multiple issues as to their cross motion on which they sought judgment of $8 million. For example, we pointed out that there was not. If the Court got beyond the coverage question, it doesn't lead inexorably to the conclusion that the $8 million stipulated judgment was appropriate. There was no proof of faxes during two of the periods. I mean, this was all a stipulated judgment geared to getting as much insurance as was available. Take a look. It's all in the record. Take a look at the testimony of the Kopenhofers. Take a look at how the affidavit came about. It was created by the lawyers. The notary wasn't even present when Mr. Kopenhofer signed the affidavit. And there are merely estimates of faxes in those earlier years. There's no proof. So if there was, and I think where the Circuit Court erred in the 2012 opinion, saying that Zurich offered no evidence of prejudice, we offered plenty of evidence of prejudice. It just wasn't considered at the very end of the Court's opinion. So with that, Your Honor, I thank you very much. And we'd ask that Mr. Haffenheim, rebuttal argument, and the cross appeal. Thank you, Your Honor. If I could, just at the outset, make a few points quickly. First of all, we did not agree on the trial court on the Lapham-Hickey test. Does this have to do with the cross appeal? Okay. So I'll confine myself to the cross appeal then. Their argument essentially is that somehow the underlying court was hoodwinked into entering the order that it did. That's preposterous. And moreover, the place to deal with that is in the underlying case. That if Zurich has a problem with that judgment, the judgment that was entered back in 2007, it's got procedures under the Illinois statutes that it can employ in order to correct an erroneous judgment. It certainly didn't appeal the judgment when it had a chance to do so back then. What we're dealing with in this case is confined to the question of whether the judgment that was entered is covered by the insurance policy. And Zurich has absolutely nothing to say about why their insurance policy wouldn't cover post-judgment interest because it clearly does. Thank you, Your Honor. Thank you, Mr. Rockenheim. We'd like to thank all the attorneys for their work on this case for the arguments today. The case will be taken under advisement with the decision rendered in due course. We'll recess.